**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------- X
XIN WANG,                                            :
                                                     :
                            Plaintiff,               :        Civil Action No.
                                                     :
            v.                                       :
                                                     :        **COMPLAINT**
CHINA MERCHANTS BANK CO., LTD.;                      :
CHENGYUE JIAO, ANDREW MAO and JIE HU,  :
each in his individual and professional capacities,  :        **Jury Trial Demanded**
                                                     :
                            Defendants.              :
------------------------------------------------------------- X

Plaintiff Xin Wang hereby alleges as follows:

## PRELIMINARY STATEMENT

1.      "**Redlining**" – the heinous practice of labeling low-income African-American

communities as "too risky" for real estate loans – was banned more than 50 years ago.  However,

studies have shown that racial discrimination in lending practices as far back as the 1930s

continues to shape demographic and wealth patterns in American communities today.

2.      Despite the abhorrent nature of this practice, Defendant China Merchants Bank

Co. Ltd. ("China Merchants Bank" or "CMB") apparently still believes that the racial

characteristics of a community should be considered in loan approvals, and put in writing that a

particular commercial loan in Harlem was deficient and could not be approved because:

> **The project is located in the Harlem neighborhood where
> income is not high, _and where the African population is more
> concentrated_.**

3.      Plaintiff Xin Wang, the former Head of Corporate Banking U.S. for CMB,

became aware of this discriminatory conduct occurring at CMB, and filed complaints and

continued to escalate those complaints across Human Resources ("HR") and senior leadership.

However, despite her efforts, CMB refused to address the blatant and ongoing discrimination,

and warned her she should not be taking a position "against the bank."  After more than eight years of employment at CMB, Ms. Wang was fired five days after she complained about CMB's racist conduct to Keith Friedland, the Chief Legal and Compliance Officer.  Ms. Wang was blatantly fired for "blowing the whistle" on CMB's discriminatory conduct.

4.      Moreover, CMB is an institution rife with discrimination across the board. CMB's New York office employs approximately 120 people, but not a single African-American. There is also extreme favoritism towards Chinese citizens – the vast majority (approximately 75 percent) of CMB's New York employees are Chinese citizens – a statistical showing that reveals irrefutable discrimination.  Out of the 17 department heads and executives at CMB in New York, 14 are Chinese citizens (approximately 82 percent).  CMB also treats age as a job qualification – it has online job postings for 175 open positions which explicitly condition eligibility for *all 175 open positions* on the applicant being **under 35 years old**.  Effectively, CMB's New York office operates with a caste-system, where Chinese citizens are permitted to act with impunity and suffer no discipline for their conduct – even when that involves blatant discrimination against numerous protected groups and highly unethical conduct.

5.      Defendants' misconduct violates numerous laws, including Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.; the New York State Human Rights Law, N.Y. Exec. Law §§ 290 et seq.; and the New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 et seq.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiff's rights

under Section 1981.  The Court has supplemental jurisdiction over Plaintiff's related claims arising under State and local law pursuant to 28 U.S.C. § 1367(a).

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) because Defendant China Merchants Bank Co., Ltd., New York Branch's headquarters are located within the Southern District of New York and a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## ADMINISTRATIVE PROCEDURES

8.      Following the filing of this Complaint, Ms. Wang will file a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ("Title VII").  When the EEOC issues Ms. Wang a notice of right to sue or otherwise dismisses her charge, she will seek leave to amend this Complaint to add claims under Title VII.

9.      Pursuant to NYCHRL § 8-502, a copy of this Complaint will be served upon the New York City Commission on Human Rights and the New York City Law Department, Office of the Corporation Counsel, within 10 days of its filing, thereby satisfying the notice requirements of that section.

10.     Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

11.     Plaintiff Xin Wang is a German citizen and resident of Irvington, New York.  Ms. Wang was terminated by Defendants from her position as Executive Vice President and Head of Corporate Banking U.S. after working for Defendants from 2009 to February 22, 2018.  At all relevant times, Ms. Wang met the definition of an "employee" under all applicable statutes.

12.     Defendant China Merchants Bank Co., Ltd. is an international Chinese bank, headquartered in Futian District, Shenzhen, Guangdong, China, which primarily engages in corporate and retail banking and treasury operations.  CMB is one of the largest banks in China with approximately 500 branches and is indirectly controlled by the Government of China through a number of wholly owned companies.  CMB maintains a location at 535 Madison Avenue, New York, New York 10022, the New York Branch ("CMBNY" or the "Bank").  At all relevant times, China Merchants Bank Co., Ltd. has met the definition of an "employer" of Plaintiff under all applicable statutes.

13.     Defendant Chengyue Jiao is, upon information and belief, a citizen of the People's Republic of China, but who resides in New York.  Mr. Jiao is employed by CMBNY as its General Manager and had direct authority over the terms and conditions of Plaintiff's employment.  In this position, Mr. Jiao was a direct participant in the retaliatory and discriminatory policies and practices to which Ms. Wang was subjected.  At all relevant times, Mr. Jiao met the definition of "employer" under all relevant statutes.

14.     Defendant Andrew Mao is, upon information and belief, a citizen of the People's Republic of China, but who resides in Connecticut.  Mr. Mao is employed by CMBNY as its Deputy General Manager and had direct authority over the terms and conditions of Plaintiff's employment.  In this position, Mr. Mao was a direct participant in the retaliatory and discriminatory policies and practices to which Ms. Wang was subjected.  At all relevant times, Mr. Mao met the definition of "employer" under all relevant statutes.

15.     Defendant Jie Hu is, upon information and belief, a citizen of the People's Republic of China, but who resides in New York.  Mr. Hu is employed by CMBNY as its Head of Risk Management and had control over the terms and conditions of Plaintiff's employment.

In this position, Mr. Hu was a direct participant in the retaliatory and discriminatory policies and practices to which Ms. Wang was subjected.  At all relevant times, Mr. Hu met the definition of "employer" under all relevant statutes.

## FACTUAL ALLEGATIONS

I.      **Ms. Wang's Professional Background**

16.      Prior to her tenure at CMBNY, Ms. Wang held several high-level positions at other international financial institutions.

17.      Ms. Wang obtained her Master's Degree in Business Administration, Finance and Business Law at the University of Hamburg and speaks fluent Chinese, English and German.

18.      In 1996, Ms. Wang became Group Treasury Manager for Beiersdorf AG, a German-based manufacturer of chemical consumer goods.

19.      In 1998, Ms. Wang joined German investment bank, WestLB.  Ms. Wang spent 11 years at WestLB, the first eight years at their Dusseldorf headquarters, and then three years at the company's New York branch.

20.      At WestLB, Ms. Wang gained broad experience in traded credit products, corporate credits and structured finance as Director and Chief of Staff to the Group Chief Credit Risk Officer of a €300 billion international bank.

21.      In October 2009, Ms. Wang joined CMBNY as the Deputy General Manager of Corporate Banking.

22.      After thriving in this position for approximately three years, in June 2012, Ms. Wang was promoted to Chief Risk Officer ("CRO").  In her role as CRO, Ms. Wang made major contributions to the Bank's good to excellent Risk Management and Asset Quality ratings by the

Federal Reserve and the New York Department of Financial Services for four consecutive years – ratings that enabled the Bank to obtain its long-coveted U.S. Private Banking license in 2016.

23.     In January 2016, despite the high quality of her performance, the Bank removed Ms. Wang from her position as CRO in order to provide the role to Jie Hu, a Chinese citizen transferred from CMB's Chinese Head Office.

24.     After Ms. Wang's position was given to Mr. Hu, Ms. Wang became Executive Vice President and Head of Corporate Banking in the United States.

25.     In this position, Ms. Wang was awarded "Employee of the Year" in 2017, with an accompanying $30,000 special bonus, due to her superb performance in developing the Bank's U.S. corporate banking business.

26.     Ms. Wang's responsibilities in this role included increasing U.S. client relationships from 6 to more than 40 clients and annual cash gross profit that exceeded $11 million.

**II.     CMB Fired Ms. Wang for Complaints of Race Discrimination**

27.     Despite being licensed and regulated by numerous federal and state government agencies including the Federal Reserve and the N.Y. Department of Financial Services, CMBNY largely operates as though it is exempt from federal and state law.

28.     One quite blatant example of this conduct occurred in 2017, and Ms. Wang had the courage to "blow the whistle" on the Bank's unlawful conduct.

29.     In or around April 2017, Morgan Stanley sought a $26.25 million participation from CMBNY for a $105 million syndicated commercial real estate loan for which Morgan Stanley was the lead financial institution.

30.     An employee within Ms. Wang's department, Majid Geramian, was CMBNY's loan originator on the project.

31.     After Mr. Geramian drafted the loan report and request, and obtained the necessary approvals from Ms. Wang and Mr. Mao, Mr. Geramian's loan report was submitted to CMBNY's Credit Approval Committee for independent review.

32.     The Credit Approval Committee was, at the time, comprised of Mr. Hu (CMBNY's Head of Risk Management), Joseph Loffredo (CMBNY's Chief Financial Officer), Keith Friedland (CMBNY's Head of Legal and Compliance) and two risk managers.

33.     As Head of Risk Management, Mr. Hu was tasked with issuing a final opinion on the loan report.

34.     Based on Mr. Hu's opinion, the Bank partially declined the loan.  Specifically, in his written analysis dated April 17, 2017, Mr. Hu listed first among the project's "**deficiencies**," that:

> **the area of Harlem belongs to the income is not high class gathering place, _and where the African population is more concentrated_.**

(Emphasis added).

35.     Quite blatantly, Mr. Hu stated that an area with a large African-American population is "not high class" and not suitable for financial investment *because of the African-American community*.

36.     For this reason, CMBNY approved only $10 million of the $26.25 million requested financing for the project.

37.     U.S. federal law strictly forbids banks from considering the racial qualities of a neighborhood in lending decisions under the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.*  Specifically, the ECOA provides, in pertinent part:

> (a) Activities constituting discrimination.  It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction—(1) ***On the basis of race, color***, religion, national origin, sex or marital status, or age . . .

15 U.S.C. § 1691(a) (emphasis added).

38.     Likewise, Regulation B, 12 C.F.R. Part 1002.4, which implements the ECOA, provides that:

> ***A creditor shall not discriminate against an applicant on a prohibited basis regarding any aspect of a credit transaction . . .*** Prohibited basis means ***race, color, religion, national origin, sex, marital status, or age . . .***

12 C.F.R. §§ 1002.4, 1002.2(z) (emphasis added).

39.     In the late summer of 2017, Mr. Geramian raised this issue internally and complained to Mr. Loffredo about Mr. Hu's racist and discriminatory conduct.

40.     However, Mr. Geramian's complaint fell on deaf ears, and Mr. Loffredo failed to respond to the complaint in any manner.

41.     Accordingly, at the end of September 2017, Mr. Geramian approached Ms. Wang to address the issue.

42.     Ms. Wang immediately realized that this conduct was discriminatory and violated the anti-discrimination laws.

43.     Accordingly, in early October 2017, Ms. Wang reported this discriminatory conduct in the workplace to Sabrina Wolf (Director of Human Resources) and Jacklyn Giraldo (a Human Resources Generalist).

44.     Also in September and October 2017, Ms. Wang reported her belief – both to Mr.

Mao and HR, respectively – that CMBNY was discriminating against employees who were not

Chinese citizens – in some cases, through harassing the employees with unwarranted internal

investigations.

45.     Ms. Wang also forwarded to Ms. Wolf the mid-year performance review of Mr.

Geramian, which outlined how Mr. Geramian's job performance was being impacted by racial

bias at the branch.

46.     Specifically, Ms. Wang forwarded Mr. Geramian's following complaint:

> ***Racial biases of the Branch Chief Risk Officer*** has greatly
> impacted one of my transactions and performance results.  I have
> been advised by several colleagues, that one of the problems with
> the transaction I proposed at 125th Street and Lenox Avenue was
> ***the high African American population nearby***.  Although CBII
> (me) requested participation of $26.25mm, only $10mm was
> ultimately allocated to the project.  ***I also understand Frank Hu,***
> ***in a note to the Head Office Risk Department, indicated that one***
> ***of the deficiencies of the transaction was "a concentration of***
> ***African population," though his note was subsequently removed***
> ***from CVM.***

(Emphasis added).

47.     After forwarding this complaint to Ms. Wolf and Ms. Giraldo, Ms. Wang

followed up with an in-person meeting to further ensure that her complaint of discrimination was

addressed.

48.      At the meeting, Ms. Wolf and Ms. Giraldo simply stated the matter was not their

responsibility and ended the meeting.

49.     On December 11, 2017, Ms. Wang and Mr. Geramian together met with Mr. Jiao

to discuss the incident, the lack of response to Mr. Geramian's previous complaint to Mr.

Loffredo and the lack of response to Ms. Wang's complaint to HR.

50.     During their meeting, Ms. Wang issued a further complaint regarding Mr. Hu's racist and discriminatory conduct.

51.     In response, Mr. Jiao just closed his eyes, listened and did not make any comment.

52.     Ms. Wang and Mr. Geramian never heard anything back from Mr. Jiao or otherwise after submitting their complaint.

53.     In early February 2018, Ms. Wang followed up with HR, and again forwarded Mr. Geramian's race discrimination complaint.

54.     Ms. Wang again went to speak with Ms. Wolf and Ms. Giraldo in person and was met with the same response as earlier – that the issue was not their problem.

55.     However, Ms. Wang would not let her complaints be "swept under the rug."

56.     On or about February 11, 2018, Ms. Wang further reported this race discrimination complaint to Mr. Mao, CMBNY's Deputy General Manager.

57.     This time, Ms. Wang received a response—Mr. Mao told her that she "**should not be taking a position against the bank and in favor of Majid**."

58.     Of course, Ms. Wang was simply trying to ensure that the Bank upheld its ethical and legal obligations and nothing more – that Mr. Mao viewed this as an affront to the Bank demonstrates the degree to which racism permeates the institution.

59.     On February 16, 2018, Ms. Wang then reported to Keith Friedland, CMBNY's Head of Legal and Compliance, not only her complaints of race discrimination, but also the complete failure of numerous senior level executives, as well as HR, to take any action in response to the previous complaints.

60.     Specifically, Ms. Wang stated:

> *We experienced racial biases of the Branch Head of Risk Department* . . . one of the problems with the transaction we proposed at 125th Street and Lenox Avenue in Harlem was *the high African American population* nearby . . . *I became more alarm, as the racial bias applied here was not just limited to an applicant, but to a very large community impacting this transaction*.  *I initially reported the issue to HR, who refused to look into the racial statement*.  Subsequently, this issue was brought to the attention of my supervisor and to the General Manager on Dec. 11th by Majid and me.

(Emphasis added).

61.     Incredibly, a mere five days later, on February 22, 2018, and after more than eight years of employment, Ms. Wang was abruptly fired for the stated reason of "organizational changes" that "resulted in [her] position being eliminated."

62.     However, this stated reason is directly undermined by Paragraph 9 of the severance agreement the Bank offered her, which provided that she "will not at any time in the future seek employment with the Bank," showing that the Bank wanted to forever rid itself of an employee who raised legitimate complaints.

63.     Ms. Wang had engaged in numerous protected complaints of discrimination over a period of time until she was ultimately fired.  The Bank's conduct is consistent with the training from an outside law firm named Littler Mendelson P.C. ("Littler") provided to the Bank's executives, department heads and senior employees in 2016 during which Ms. Wang and others were informed that if an employee complains about unlawful conduct, it is best to wait a period of time before firing them so it does not appear to be such clear retaliation.

64.     CMBNY's termination of Ms. Wang in direct response to her "blowing the whistle" on race discrimination at the Bank was blatant retaliation.

65.     Unfortunately, the termination was all too well in keeping with the Bank's many discriminatory and unlawful operating practices.

III.     **CMBNY's Deeply-Embedded Culture of Discrimination**

66.     The Bank's retaliatory treatment of Ms. Wang is but one example in an institution where racial discrimination runs rampant.

**Race Discrimination**

67.     Notably, CMBNY has approximately 120 employees and executives and not a single one is African American, despite the large Black population of New York City.  This is a complete statistical impossibility if the Bank is engaged in legitimate, non-discriminatory hiring practices.

68.     This extreme lack of diversity is consistent with CMBNY's position in the April 2017 lending transaction in which CMBNY partially denied a loan on the express and stated basis of the racial makeup of the area of the real estate.

69.     Additionally, CMBNY executives prefer to use White American employees in positions that interact with the public and with financial regulators to hide the fact that most of the Bank's employees and executives are Chinese citizens.

70.     For instance, but only by way of example, in 2013, the position of Assistant General Manager to oversee Risk Management was vacant.  Aware of the vacancy, Ms. Wang informed Mr. Jiao that she would like to be considered as a candidate for the position. Unabashedly, Mr. Jiao responded:

> *No!  You won't qualify.  We need a white guy in that position.  A white guy looks more credible to the regulators*.

71.     On another occasion, on or around July 26, 2016, CMB's HR department openly posted on its intranet page, visible to all of CMB's employees and staff, a description of recent happenings at the Bank:

> We recently sent a team to the best asset management firm (in the US) to learn from them.  At Wall Street, the colleagues from CMB communicated face-to-face with ***all kinds of blonde, tall, rich and good-looking guys***.

(Emphasis added).

72.      This statement, like many others, shows just how commonly race is considered as a defining characteristic at CMBNY – and that use of protected categories in business operations is part of standard operating procedure at CMBNY.

**Citizenship and Nationality Discrimination**

73.     In addition to widespread discrimination on the basis of race, CMBNY just as blatantly discriminates on the basis of citizenship and national origin.

74.     The Bank openly considers employees to be on an unofficial, but uniformly-applied, tiered system, with top-tier employees receiving the best positions, salaries and perquisites that lower-tiered employees are denied.

75.     Chinese citizens, particularly those sent from China with "good ideological and political quality," as described in CMB's Administrative Manual, are considered by CMBNY to be "first-tier" employees.

76.     The Bank considers all others to be second-class employees who are needed to carry out every day work and for appearances.

77.     This even includes non-Chinese citizens who have Chinese ancestry, such as Ms. Wang.

78.     The Bank largely overlooks policy breaches and other misdeeds committed by members of the top-tier group.

79.     Examples of the Bank ignoring the misdeeds of favored Chinese employees abound.

80.      For instance, but only by way of examples, the Bank looked the other way when Jian Kevin Ding violated Bank policy and altered the credit agreement of an insolvent borrower. Specifically, Mr. Ding replaced the signature page of the credit agreement to falsely suggest that all defaults of the borrower had been waived.  Even though the Bank was aware of this transgression, it later promoted Mr. Ding to Assistant General Manager of the Corporate Banking Department.

81.     As another example, the Bank also ignored when Mr. Hu violated Regulation B and the ECOA by partially denying a loan based on racial considerations.

82.     Similarly, when Minqiang Wu violated federal and New York employment laws by informing an employee that she was too old for a promotion, he was permitted to keep his leadership role at the Bank.

83.     Likewise, upon information and belief, Mr. Jiao accepted gifts from Yejun He (known in the U.S. as Wei Chen), a known fugitive[1] and is allowed to remain CMBNY's General Manager.  Misdeeds of top-tier employees are routinely overlooked whereas non-Chinese employees are harassed by unwarranted internal investigations, written warnings and termination.

---

[1]     Mr. Chen is reportedly listed on China's Operation Sky Net List of 100 most-wanted fugitives.  Defendant Jiao previously allowed Mr. Chen to entertain him at a private club and then hired Mr. Chen's daughter as an intern.  Upon belief, this also constituted a violation of the Bank's policy prohibiting the acceptance of gifts valued in excess of $100.

84. CMBNY's caste system is not even a "well-kept secret" – rather, just the opposite. The Bank seemingly believes that its wide-spread discrimination in favor of Chinese citizens is somehow permissible on the basis that the Bank is Chinese-owned and operated.

85. In fact, the Administrative Manual for the Management of CMB Employees Assigned to Foreign Units expressly reflects that that the primary consideration in determining which employees will be assigned to work at the CMBNY branch is "Good ideological and political quality" – an obvious proxy for political allegiance. This further shows that the Bank's primary criteria for hiring and promoting employees are not skill or achievements, but rather, employees' immutable and political characteristics.

86. CMBNY's discrimination against non-Chinese citizens is apparent from the sheer number of Chinese citizens employed by CMBNY.

87. Of CMBNY's approximately 120 employees, approximately 25 percent of the total staff are non-Chinese citizens. Of the around 25 to 30 non-Chinese employees, eight were hired and managed by Ms. Wang.

88. Currently, out of the 17 department heads and executives at CMBNY, only three are non-Chinese citizens (18 percent).

89. Discrimination against non-Chinese citizens has been a continuing problem at CMBNY, such that, in 2015, a group of employees submitted a complaint of discrimination to Human Resources.

90. In response to this complaint, an internal investigation was conducted by the Bank's outside employment counsel, Littler. Littler attempted to downplay the allegations by stating in conclusion that the investigation showed that the disparate treatment was "just a cultural issue."

91.     In addition to the complaints set forth above, Ms. Wang has directly reported her concerns of citizenship discrimination to the Deputy General Manager and HR.

92.     Specifically, on or about September 5, 2017, Ms. Wang reported to Mr. Mao via email, and later in person, her belief that employees who were not Chinese citizens were regularly discriminated against and that some were even unfairly targeted and harassed through unwarranted written warnings.

93.     Between January 8 and 17,  2018, Ms. Wang also reported to Ms. Wolf and Ms. Giraldo her belief that employees who were not Chinese citizens were regularly discriminated against and that some were even unfairly targeted and harassed through unwarranted internal investigations.

94.     Upon information and belief, nothing was done to remedy these issues, other than to terminate Ms. Wang to stymie any further complaints.

95.     Likewise, despite Ms. Wang's previous role as CRO, her decisions and authority were often undermined.

96.     By way of example, in the summer of 2012, when Ms. Wang discovered that Mr. Ding had withheld materially negative information in a credit application and disbursed a loan to a borrower who was poised to enter bankruptcy, she alerted Mr. Jiao, who then he held a meeting with Ms. Wang and Mr. Ding to discuss the situation.

97.     Rather than validate Ms. Wang's serious and appropriate concerns over the issue, Mr. Jiao jovially patted Mr. Ding on the shoulder and proclaimed, "You rogue boy, you should not do this again."  No further mention was made of the incident.

98.     In fact, upon information and belief, CMBNY intentionally concealed the incident from CMB's Head Office.

99.    CMBNY promoted Mr. Ding the following year to Assistant General Manager of the Corporate Banking Department, and in 2015, removed Ms. Wang from her role as CRO to offer the position to Mr. Hu, an unqualified Chinese citizen who was transferred from China.

100.    Furthermore, in December 2015, Ms. Wang learned of a substantial discrepancy between her salary as CRO and the salary of James Fu (CMBNY's Chief Technology Officer).

101.    Mr. Fu and Ms. Wang have comparable years of experience, and, at the time, held comparable levels of responsibility at the Bank.

102.    Ms. Wang notified Mr. Jiao that she felt it was improper that Mr. Fu was earning $75,000 more per year than her.

103.    Mr. Jiao corrected Ms. Wang, boldly responded that Mr. Fu made *closer to $100,000 more than Ms. Wang* and said, "You can't compare yourself with James.  James is a member of the Banzi."[2]

104.    After Ms. Wang's CRO position was given to a Chinese citizen who lacked adequate qualifications for the role (indeed, Ms. Wang's replacement would later violate federal law by considering race in conjunction with loan applications, as mentioned above), CMBNY forced Ms. Wang to interview for a new position, whereas Chinese citizens were always automatically promoted to higher positions without requiring further interviews.

105.    Ms. Wang successfully interviewed for the role of Executive Vice President and Head of Corporate Banking for the United States and took on this role beginning in January 2016.  This role was short-lived, as Ms. Wang was fired for "blowing the whistle" on the pervasive race discrimination at CMBNY.

---

[2]    At CMBNY, the term "Banzi" refers to the group of people who are considered the "true leaders" of the Bank and who control the most important of CMBNY's business and personnel decisions.

**Age Discrimination**

106.    The rampant discrimination does not stop there.

107.    CMBNY also regularly discriminates on the basis of age.

108.    Case-in-point:  CMB's online job postings for its open positions explicitly condition eligibility for *all 175 open positions* on the applicant being *under 35 years old*.

109.    As another example, in 2017, Minqiang Wu (CMBNY's Head of Strategy and Business Development), and, ironically, then-Head of Human Recourses, told Ms. Giraldo that she was "*too old for promotion and should be happy that she still [had] a job and health benefits*."

110.    In fact, this was the explanation Mr. Wu gave Ms. Giraldo for his decision to promote a younger, less-qualified employee.

111.    Although Mr. Wu was later removed from his position as Head of HR, Mr. Wu's outdated ageist and sexist opinions remain prevalent at the Bank, evidenced in part by the Bank's decision to keep Mr. Wu in his leadership position of Head of Strategy and Business Development even after his blatant discriminatory treatment of an employee.

112.    In sum, CMB and CMBNY "lean in" to an environment where race discrimination, citizenship discrimination, and age discrimination are not only tolerated but embraced, and where those who oppose this discriminatory regime are targets for retaliation

**FIRST CAUSE OF ACTION**
**(Retaliation in Violation 42 U.S.C. § 1981)**
*Against All Defendants*

113.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

114.     By the conduct described above, Plaintiff engaged in protected activity by reporting race discrimination in employment, race discrimination in contractual relationships and race discrimination in business decisions at CMBNY.

115.     By the conduct described above, Defendants violated 42 U.S.C. § 1981 by taking adverse employment actions against Plaintiff in response to Plaintiff's protected activity, including, but not limited to, terminating Plaintiff's employment on February 22, 2018.

116.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and emotional harm for which she is entitled to an award of damages to the greatest extent permitted by law.

117.     Defendants' unlawful and discriminatory actions constitute malicious, willful, wanton and/or reckless violations of Section 1981 for which Plaintiff is entitled to an award of punitive damages.

### SECOND CAUSE OF ACTION
**(Retaliation in Violation of the NYSHRL)**
*Against All Defendants*

118.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

119.     By the actions described above, among others, Defendants retaliated against Plaintiff on the basis of her protected activities in violation of the NYSHRL, N.Y. Exec. Law §§ 290 *et seq.*, by, *inter alia*, terminating her employment for engaging in the protected activity of reporting discriminatory practices.

120.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of damages.

121.     Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of the NYSHRL for which Plaintiff is entitled to an award of punitive damages.

122.     To the extent that Defendants Jiao, Mao and Hu are not individually liable as Plaintiff's employer, Defendants Jiao, Mao and Hu are liable under the NYSHRL because they aided and abetted the unlawful retaliatory conduct.

**THIRD CAUSE OF ACTION**
**(Retaliation in Violation of the NYCHRL)**
***Against All Defendants***

123.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation as contained in each of the preceding paragraphs as if fully set forth herein.

124.     By the actions described above, among others, Defendants retaliated against Plaintiff on the basis of her protected activities in violation of the NYCHRL, N.Y. City Admin. Code §§ 8-101, *et seq.*, by, *inter alia*, terminating her employment for engaging in the protected activity of reporting discriminatory practices.

125.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of damages.

126.     Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of the NYCHRL for which Plaintiff is entitled to an award of punitive damages.

127.     To the extent that Defendants Jiao, Mao and Hu are not individually liable as Plaintiff's employer, Defendants Jiao, Mao and Hu are liable under the NYCHRL because they aided and abetted the unlawful retaliatory conduct.

### FOURTH CAUSE OF ACTION
### (Discrimination in Violation of the NYCHRL)
### *Against All Defendants*

128.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

129.     Defendants have discriminated against Plaintiff on the basis of her citizenship in violation of the NYCHRL by denying her the same terms and conditions of employment available to Chinese citizens.

130.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer monetary and/or economic harm for which she is entitled to an award of damages.

131.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, emotional distress for which she is entitled to an award of compensatory damages.

132.     Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

133.     To the extent that Defendants Jiao, Mao and Hu are not individually liable as Plaintiff's employer, Defendants Jiao, Mao and Hu are liable under the NYCHRL because they aided and abetted the unlawful discriminatory conduct.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.     An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees, representatives or persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

B.     A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the applicable federal, state and city laws;

C.     An award of damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for all monetary and/or economic damages;

D.     An award of damages in an amount to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish and emotional distress, emotional pain and suffering and any other physical and mental injuries;

E.     An award of damages to be determined at trial, plus pre-judgment interest, to compensate Plaintiff for harm to her professional and personal reputation and loss of career fulfillment;

F.     An award of punitive damages;

G.     An award of costs that Plaintiff has incurred in this action, as well as reasonable attorneys' fees to the fullest extent permitted by law; and

H.     Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: May 8, 2018
New York, New York

Respectfully submitted,

**WIGDOR LLP**

By: _____
Douglas H. Wigdor
David E. Gottlieb
Moorea L. Katz (admission pending)

85 Fifth Avenue
New York, NY  10003
Telephone:  (212) 257-6800
Facsimile:   (212) 257-6845
dwigdor@wigdorlaw.com
dgottlieb@wigdorlaw.com
mkatz@wigdorlaw.com

*Counsel for Plaintiff*